ANDREW, J.T.C.
In this matter plaintiff, WCI-Westinghouse, Inc., seeks a reduction in its local property tax assessment for the tax year 1983 while defendant, Edison Township, seeks an increase in the original assessment.
Although plaintiff-taxpayer contends that the assessment for the tax year in question is in excess of fair market value, it has *613 abandoned any claim of discrimination or inequality in assessment presumably because 1983 was a revaluation year for Edison and therefore the provisions of chapter 123 are not applicable.
The property involved in this proceeding is known and designated as Block 1120, Lot 63 on the tax map of Edison Township and was originally assessed for the tax year in question as follows:
Land $ 2,989,800
Improvements 8,239,900
Total $11,229,700
Both taxpayer, WIC- Westinghouse, Inc., and taxing district, Edison Township, filed appeals from the original assessment. Taxpayer sought direct review of the original assessment for tax year 1983 in this court pursuant to N.J.S.A. 54:3-21 seeking a reduction in the original assessment. Edison filed an appeal from the original assessment with the Middlesex County Board of Taxation seeking an increase in the original assessment. The county board affirmed the original assessment and Edison thereafter filed an appeal from that judgment with this court. These appeals were consolidated and it was understood that the taxpayer would be denominated the plaintiff and the taxing district would be denominated the defendant although it was understood that each had the burden of proof in its affirmative case. See Clearview Gardens v. Parsippany-Troy Hills Tp., 196 N.J.Super. 323, 330 (App.Div.1984).
Plaintiff, through its expert appraiser, Dale R. Kilpatrick, contends that the fair market value of the subject property as of October 1, 1982 was $7,550,000 and therefore the appropriate assessment would be $7,550,000.
Defendant, through its expert appraisers, Frank L. Sullivan and Robert Scrivens, contended originally that the subject’s fair market value as of the same assessing date was $30,724,800. However, after some corrections and modifications made by its appraisal expert, Sullivan, defendant, at the conclusion of the trial, asserted that the fair market value and thus the appropriate assessment for the tax year 1983 would be $25,982,250.
*614 At the outset it should be noted that the parties stipulated that the land value was $60,000 an acre and that this court could restrict its value determination to the improvements. The agreed upon land value was the original assessment for land ($60,000 X 49.83 acres = $2,989,800).
There were no substantial disputes between the parties respecting the physical description of the property. It consists of 49.83 acres of land area and is located on the southeast side of Route 27 (Lincoln Highway) at its intersection with Vineyard Road, Edison. The site is level, at road grade and improved with a one-story masonry and steel manufacturing-warehouse facility with a two-story attached office and laboratory building along with some minor structures. The area of the improvements, as stipulated by the parties, totals 943,725 square feet. Of the total square footage approximately 10% is devoted to offices and engineering laboratories, 47% to manufacturing and storage, 1.5% to joint manufacturing and warehouse and 41.5% to warehouse use.
The improvement was originally constructed in 1951 and consisted of approximately 340,000 square feet of manufacturing and storage space and 93,000 square feet of offices and laboratories. A warehouse of approximately 151,000 square feet was added in 1953 and a warehouse of approximately 360,000 square feet was added in 1967. From the time of the original construction of the improvement in 1951 through 1967 plaintiff manufactured at various times radios, portable appliances, fuses, food waste disposals, television sets, phonographs and transmitters. It also produced hair-dryers and hair-curlers until 1969 at which time it completely changed its manufacturing process in order to produce room air-conditioners, dehumidifiers and humidifiers which it has continued to manufacture to date. The testimony revealed that while changes in the manufacturing process took place over a period of years these changes did not necessitate a restructuring of the building itself.
*615 As indicated by plaintiffs plant manager the only changes required in the structure were the addition of a number of concrete isolation pads measuring approximately six feet by eight feet and some to a depth of 14 feet to support the weight of and restrict vibration of heavy metal presses, the addition of steel supports to accommodate heavy cranes and the opening of a small section of roof to permit the installation of heavy metal presses.
The condition of the improvements was considered to be good and well maintained. The property is serviced by all public utilities including gas, electricity, water and sewer. The subject site enjoys excellent highway facilities in its Edison location in that it is served by the New Jersey Turnpike, Interstates 78 and 287, the Garden State Parkway and U.S. Routes 1 and 22.
The experts were not in agreement relative to the issue of the highest and best use of the subject property. Plaintiff’s expert, Kilpatrick, considered the existing improvements to be a general-purpose manufacturing and warehouse facility, typical of industrial development in the Edison area. It was his opinion that the highest and best use of the property was for general industrial usage.
On the other hand, defendant asserted that the existing improvements were “specifically constructed” to house “a particular manufacturing operation” and constituted a special purpose property,[1] therefore the highest and best use is plaintiff’s precise use which employs all of the special features of the improvements. The difficulty with defendant’s contention is that it is not supported by the testimony of its own experts. One of defendant’s experts, Dr. Kevin J. McDermott, an associate professor of industrial engineering at the New Jersey *616 Institute of Technology admitted that the building itself was not special purpose because it would be financially feasible to convert the building to other uses. Defendant’s appraisal expert, Scrivens, also conceded that the subject building was “not special purpose in the sense” that it could “be converted to an alternative use without large expenditures of capital.” Scrivens further indicated that the building had “flexibility” and “it’s pretty easily convertible.”
Admittedly, the building does have some features which render the property suitable to the owner’s use but these features do not make the property special purpose in nature. Sunshine Biscuits, Inc. v. Sayreville, 4 N.J.Tax 486, 495 (Tax Ct.1982); Dworman v. Tinton Falls Bor., 1 N.J.Tax 445, 452 (Tax Ct.1980), aff’d o.b. per curiam 3 N.J.Tax 1, 180 N.J.Super. 366, 434 A.2d 1134 (App.Div.1981), certif. den. 88 N.J. 495, 443 A.2d 709 (1981), Willingboro Chrysler/Plymouth v. Edgewater Park, 6 N.J.Tax 168, 178 (Tax Ct.1983). Even defendant’s construction expert, Frank L. Sullivan, stated that the special features were not uncommon and could be found in a number of manufacturing facilities.
I cannot conclude that the subject is special purpose property so as to require the further conclusion that the highest and best use of the subject is the exact current use by plaintiff. Moreover, and more importantly, one of the elements in any highest and best use analysis has not been established by defendant. In order to constitute a particular use as the property’s highest and best use, the selected use in a value in exchange context must be a probable use for which there must be a demand in the relevant market. International Association of Assessing Officers, Property Assessment Valuation (1977) at 22-25; Real Estate Appraisal Terminology, supra at 107. Since defendant has asserted that plaintiff’s particular use is the property’s highest and best use, it is defendant’s burden to demonstrate a demand for the current use in the market generally and that that demand would probably influence market value. If plaintiff were to expose the property for sale, *617 would there be a market of buyers with the exact requirements of plaintiff? A review of the record in this case does not permit an affirmative answer.
The record reveals that there have been a wide diversity of manufacturing uses in the subject and that it is readily adaptable to a number of manufacturing and warehousing activities. Therefore, I find, as asserted by Kilpatrick, plaintiffs appraisal expert, that the subject facility is a general-purpose industrial building capable of housing many various manufacturing processes and that its highest and best use is as a general-purpose manufacturing-warehouse facility not specifically limited to plaintiff’s manufacturing process.
 As previously indicated, plaintiff filed a direct appeal to this court while defendant filed an appeal from the original assessment with the county board and after the county board affirmed that assessment, filed an appeal with this court. In this proceeding, then, each party has the burden of proof on its respective affirmative case. Plaintiff in seeking a reduction in the original assessment has the ultimate burden of proof to establish that the original assessment is incorrect and what the correct assessment should be. Rodwood Gardens v. Summit, 188 N.J.Super. 34, 38-39, 455 A.2d 1136 (App.Div.1982); Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 75, 208 A.2d 153 (App.Div.1965); Glenwood Realty Co., v. East Orange, 78 N.J.Super. 67, 70, 187 A.2d 602 (App.Div.1963); Passaic v. Botany Mills, Inc., 59 N.J.Super. 537, 543, 158 A.2d 205 (App.Div.1960), Rumson v. Peckham, 7 N.J.Tax 539 (Tax Ct.1985). By the same token, defendant, in seeking an increase, has the same burden to establish that the assessment is incorrect and again what the correct assessment should be. Ibid. The standard of proof required of each party in its affirmative case is the “preponderance of the evidence.” N.J. S.A. 2A:84A-5; Evid.R. 1(4).
In this case I am not satisfied that either party sustained its requisite burden of proof. A review of the entire record does not reveal that the original assessment and/or the county *618 board judgment is in fact incorrect. Therefore, for the reasons to be hereinafter stated, I affirm the total assessment of $11,229,700 which represents both the original assessment and the county board judgment for tax year 1983.
It is helpful to consider the guiding criterion in this ease before proceeding to an analysis of each party’s proofs because the concept of value is abstract and requires specific definition in order to give it meaning. For the purposes of ad valorem property taxation in New Jersey the standard has been set forth in N.J.S.A. 54:4-23 which requires an assessor to:
... determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1 ... [of the pretax year],
This statutory criterion has been more particularly expressed in terms of the price which could be obtained for the property, in money, at a fair sale between a willing seller and a willing buyer. New Brunswick v. Tax Appeals Division, 39 N.J. 537, 543, 189 A.2d 702 (1963). As our Supreme Court has noted fair market value is expressed in terms of the value which property has in exchange for money. Hackensack Water Co. v. Tax Appeals Division, 2 N.J. 157, 163, 65 A.2d 828 (1949); Gilbraltar Corrugated Paper Co. v. North Bergen Tp., 20 N.J. 213, 218, 119 A.2d 135 (1955). Thus our statute provides a value in exchange criterion to determine an appropriate assessment. This is as opposed to a value in use concept which embodies the premise that value is within the object itself. The phrase value in use has been defined as
The value of an economic good to its owner-user which is based on the productivity ... of the economic good to a specific individual; subjective value. May not necessarily represent market value. [Boyce, Real Estate Appraisal Terminology (1975) 216]
Defendant, Edison, contends that the only method by which we can arrive at fair market value for the subject property is by means of a cost approach analysis, while plaintiff asserts that the direct sales comparison or market data approach provides the only sure guide to value in this case.
Plaintiff’s appraisal expert, Kilpatrick, relied solely upon the market data approach while defendant’s two experts, Sullivan *619 and Scrivens, in a combined appraisal report, relied exclusively on the cost approach to value. There was agreement among all the experts, both plaintiff and defendant, that the income approach could not be utilized because of a lack of sufficient market data which precluded an accurate estimation of fair market rent.
Kilpatrick however, also felt that the cost approach could not be employed because of the inherent difficulty in measuring all forms of depreciation. It was his view that the market data approach reflected the actions of buyers and sellers in the marketplace and thus should control in any event.
Sullivan and Scrivens eschewed the market data approach because they were of the opinion that there were no sales of industrial properties capable of being reasonably compared to the subject. Thus, they felt that they were required to employ a cost analysis.
Our Supreme Court has indicated that the answer as to which approach should predominate depends upon the facts in the particular case. New Brunswick v. Tax Appeals Division, supra. What we are seeking, however, is the price reasonably expected to be obtained for the subject property through the actions of the marketplace.
This court has indicated on a number of occasions that the cost approach can be of preponderant influence essentially because the proofs submitted in support of that approach were more reliable than any other approach. ITT Cont’l Baking Co. v. East Brunswick Tp., 1 N.J.Tax 244 (Tax Ct.1980); Pennwalt Corp. v. Holmdel Tp., 4 N.J.Tax 51 (Tax Ct.1982). However, when properly applied, the market data approach to value is usually considered to be the most useful and effective in developing an estimate of value because it attempts to predict the likely activity in the actual marketplace. Sunshine Biscuits, Inc. v. Sayreville, 4 N.J.Tax 486, 497-498 (Tax Ct.1982); Kinnard, Messer and Boyce, Industrial Real Estate (3 ed. 1979) 445. Having said that the market data approach to value is of *620 great significance does not end the inquiry. It must be determined whether it was appropriately applied in this case.

Market Data Approach

Plaintiffs expert, Kilpatrick, analyzed five sales of improved industrial manufacturing-warehouse facilities which had an unadjusted sale price range of $9.87 a square foot to $11.02 a square foot for building area with the land merged. The alleged comparable improved properties ranged in size from 430,925 square feet of improved space to 966,790 square feet. Initially, in an attempt to narrow the range of dissimilarities, Kilpatrick adjusted each of the sale properties for excess land, i.e., that land not necessary to support the primary use. He utilized the land to building ratio of the subject which purportedly had no excess land as the base and then mathematically calculated the amount of excess land for each comparable property, assigned a value to such land and then subtracted the value of the excess land from the sales price of each comparable property which reduced his unadjusted sales price range as previously given to $7.44 a square foot to $9.64 a square foot.
Thereafter he made “up” and “down” adjustments as and if required for each comparable property for age, quality of building, clear ceiling heights, time, office area and size. These “up” and “down” adjustments were not quantified in either dollars or in percentages. He did not provide an adjusted sale price range for the comparable sales properties after his “up” and “down” adjustments but concluded a value of $8 a square foot for the subject which produced a rounded value estimate of $7,550,000 ($8 X 943,725 square feet = $7,550,000 rounded). In answer to a question by this court as to the property’s most probable value range, Kilpatrick indicated that the most probable selling price for the subject would be between $7.50 a square foot ($7,078,000 rounded) and $10 a square foot ($9,437,-300 rounded).
Edison claims that plaintiff’s market data approach is invalid essentially on three grounds. First, the alleged comparable *621 properties are not in fact reasonably comparable. Second, the adjustments made by Kilpatrick were unsupported by market data in the record and, lastly, Kilpatrick failed to quantify his adjustments which failure precludes this court from reasonably evaluating such adjustments and ultimately his final conclusion.
Because of the importance I believe should be placed on the quantification of adjustments in the market data approach, I will first consider defendant’s argument as to Kilpatrick’s failure to quantify his adjustments. Plaintiff asserts that while adjustments are critical in a market data approach there should be flexibility in the manner in which they can be made. Plaintiff states in its brief that “dollar and percentage adjustments are favored but ... not always utilized in appraisals.” However, plaintiff fails to indicate why nor does plaintiff supply justification for not making dollar or percentage adjustments. As its only authority for net or lump sum adjustments (in lump sum adjustments no formal attempt is made to adjust separately for individual differences) plaintiff cites an appraisal article appearing in the 1978 edition of the Encyclopedia of Real Estate Appraising, i.e., Parvin, “Market Approach to Value,” Friedman, Encyclopedia of Real Estate Appraising (3 ed. 1978) at 32.
It is clear that plaintiff’s expert failed to quantify his adjustments with respect to the properties which were presented as comparable, either in dollars or by percentages, but rather relied upon adjustments of “up” or “down” for particular areas of comparison. It is just as evident that plaintiff’s expert did not provide this court with an adjusted sale price for each comparable property after the application of his “up” and/or “down” adjustments to each sale property.
This court has previously indicated that it prefers a market analysis in terms of specific items and their individual affect on value measured by dollar or percentage adjustments. Red Devil, Inc. v. Union Tp., 5 N.J.Tax 1, 5 (Tax Ct.1982). The reason is obvious, absent quantification this court cannot judge either the validity of the individual adjustment or the ultimate *622 conclusion. When an appraiser adjusts “up” the question that quickly comes to mind is—how high is up? It was only because lump sum adjustments and whole property comparisons[2] were sanctioned appraisal techniques by the seventh edition of The Appraisal of Real Estate, American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978) at 286, that this court determined that the testimony of the taxpayer’s expert in Red Devil, Inc. overcame the presumption of correctness attached to the original assessment. However, since that time appraisal thinking has undergone a change. The most current edition of The Appraisal of Real Estate reflects the view that adjustments can be applied to a comparable property in essentially only two ways, either in percentage or in dollars. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) at 317-318. There is a conspicuous absence of the whole property comparison or lump sum method of adjustment. Ibid.
While this court has a certain degree of knowledge and expertise in local property tax matters, see Glen Wall Assoc. v. Wall Tp., 99 N.J. 265, 280, 491 A.2d 1247 (1985), it cannot legitimately review the adjustment process as utilized in this case and arrive at an informed determination.
For example, if an appraisal expert makes an “up” or “upward” adjustment for location and the trier of fact disagrees, he can only reject the ultimate conclusion of value because he cannot modify the adjustment by increasing, decreasing or eliminating it since there is no way of knowing the extent of the individual adjustment on the overall value concluded by the *623 expert. Even if the trier of the facts agrees that the “upward” adjustment is called for, the trier cannot determine the extent of the upward adjustment since the expert has not quantified it and therefore the trier of facts is again consigned to a position of either accepting or rejecting the expert’s ultimate conclusion with regard to value.
Moreover, it is conceivable that two experts appraising the same property and making exactly the same “up” and “down” adjustments may arrive at two totally different value conclusions based on the unquantified extent of the “up” and “down” adjustments known only to the individual appraiser.
My rejection of plaintiff’s application of the market data approach is not premised exclusively upon plaintiff’s failure to quantify adjustments but also includes a number of other deficiencies to which I will refer as to each comparable property which also make plaintiff’s valuation estimate unreliable.
Preliminarily, it should be noted that, with the exception of Kilpatrick’s comparable sale number five, his excess land adjustments were not supported by market evidence of land sales in the municipalities in which the allegedly comparable properties were located.
I found plaintiff’s analysis of sale number one to be deficient for a number of reasons. The first of which was Kilpatrick’s inability to inspect the interior of the comparable property. It is difficult to understand how an expert can make an appropriate comparison without viewing the property used for comparison. In the absence of an onsite inspection, there is no way for this court (or the expert for that matter) to determine whether the interior of the allegedly comparable property required an adjustment for interior finish or physical amenities. This alone causes little weight, if any, to be assigned to comparable sale number one. Additionally, plaintiff’s expert made no adjustment for office space even though the subject had approximately 10% office space as compared to only 2.7% for the comparable property.
*624 Plaintiff’s comparable sale number two is also deficient for a number of reasons. This sale was subject to an existing 15-year lease at a contract rental of $1.26 a square foot. There were no market data in the record to indicate whether this contract rental was in fact economic or fair market rent at the time of the sale. This is important because if the contract rental were below fair market rent, the price achieved would reflect the uneconomic rental in a lower than market value price. On the other hand, contract rent above fair market rent would reflect in a higher than market value price. The reason for this phenomenon is obvious. The owner is selling only what he owns not his tenant’s interest. If a tenant has a leasehold interest because the rental he is required to pay is less than fair market rent that interest does not pass to a buyer who purchases subject to an existing lease.
 Generally, a leasehold has a value if the fair market rent or economic rent of the property is in excess of the rent reserved in a lease. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) at 545. This is reflected in the fact that a lessee can sublet the premises for more than the contract rent and thus receive an income stream above the rental due his lessor. This income can be capitalized over the life of the lease term and represents a present value to the lessee. Very simply, the question here is whether the owner in the comparable sale sold a leased fee encumbered with a leasehold interest. Kilpatrick’s statement that the contract rent is economic is not supported by an analysis of comparable leases and is therefore pure conjecture. Hence, since the sale price could have reflected the burden of a noneconomic lease and as plaintiff failed to sustain its burden of proof in this regard the sale cannot be used as a valid indication of value.
Moreover, Kilpatrick made no adjustment for location for comparable property number two in relation to the subject. Based on my review of the record which indicates that the comparable property was situate in South Brunswick in a *625 largely undeveloped agricultural area and did not enjoy the same major highway network as the subject there was a clear requirement for an adjustment for location. The difference in the physical quality of the subject as compared to comparable number two which was a corrugated metal “light duty structure” also required an adjustment which Kilpatrick did not make.
Plaintiffs comparable sale property number three was located in Cranbury. There were deficiencies in the analysis of plaintiffs expert in regard to this comparable property. To begin with, this sale was subject to a five year leaseback for 250,000 square feet of space to the seller at a contract rental of $2.35 a square foot. Here, as with sale number two there was no market data to support the conclusion that the contract rent was in fact economic rent at the time of the sale. For the reasons expressed relative to sale number two plaintiff has failed to sustain its burden of establishing that the sales price did not reflect the burden of a noneconomic lease and therefore sale number three cannot be used as a valid indication of value.
Moreover, no adjustment was made by plaintiffs expert for the difference in physical quality of sale property number three as compared to the subject even though Kilpatrick conceded that an adjustment should have been made. Sale property number three was described as being a metal-clad “light duty” uninsulated building not in the same construction classification as the subject, therefore, this difference should have been adjusted.
Plaintiffs comparable property number four was located in North Bergen. Here, again, the comparison analysis of plaintiffs expert was deficient. First, Kilpatrick made no adjustment for office space even though it was clear that sale number four had only two percent office space as compared to the subject which had ten percent.
Second, the record demonstrates that the location of sale number four, including the highway network available, is not as good as that of the subject. As pointed out by defendant’s *626 expert this is evidenced by the fact that there is little new industrial development in the area of sale number four despite the fact that there is land available for industrial development while there is a great deal of industrial development in the area of the subject. This merely reflects the desires and actions of industrial market participants and should have been demonstrated in plaintiffs appraisal.
Third, there was also evidence to demonstrate that sale number four was a corrugated metal-clad building not in the same construction category as the subject. An appropriate adjustment should have been made by plaintiff’s appraiser in this regard.
With regard to sale property number five located in Linden, New Jersey, plaintiff’s expert stated that this sale property was not a primary indicator of value and was used as a crosscheck only. This was due to the fact that sale property number five had only 430,925 square feet of improved space or less than one-half of the subject. I find that the size differential alone militates against giving any significant weight to sale number five. A potential purchaser seeking the space offered by the subject (943,725 square feet) would not be looking for a building with half that space. Even Kilpatrick’s rough classifications [3]of the various markets for industrial properties would rule out consideration of comparable sale number five as a value indicator for the subject.
Additionally, Kilpatrick made no adjustment for office space even though comparable number five had only 1.7% office space as compared to 10% in the subject.
*627 Kilpatrick adjusted sale number five downward for location to indicate that the sale property’s location was superior to the subject. The evidence does not totally support this conclusion. While sale number five has the proximity of the new Jersey Turnpike, it does not enjoy the advantages of the broad transportation network shown to be available to the subject. This is reflected to a large extent in the rapid industrial development in Edison in recent years. Moreover it was shown that sale number five is located opposite a residential area and adjoining a commercial area. These adjacent uses are not conducive to a good industrial climate.
This location adjustment highlights the initial difficulty expressed by this court relative to the manner in which plaintiff’s expert made all his adjustments. After reviewing all of the proofs I might agree with plaintiff’s expert that a slight downward adjustment was called for, but how do I determine if the expert’s downward adjustment was slight or whether it was substantial. Even if that determination is made how can this court modify the adjustment? To do so requires quantification.
My review of all the evidence in this case, leads me to conclude that plaintiff by its application of the market data approach has failed to sustain its burden of proof to establish a value which is at variance with the original assessment.
However, this conclusion necessitates a review of defendant’s cost approach analysis in light of its affirmative claim for an increase in assessment.

Repoduction Cost Approach

According to the American Institute of Real Estate Appraisers,
Reproduction cost is the cost of construction at current prices of an exact duplicate, or replica, using the same materials, construction standards, design layout and quality of workmanship, and embodying all the deficiencies, super adequacies, and obsolescence of the subject building. [The Appraisal of Real Estate, supra at 447]
Here, defendant, primarily through its expert, Sullivan, provided a reproduction cost analysis using the pricing data from *628 the Marshall Valuation Service, a nationally known building cost manual published by the Marshall and Swift Publication Company. Sullivan segregated the major portions of the improvements into four different areas, i.e., office, manufacturing (1951), manufacturing (1953) and manufacturing and warehouse (1967) and applied the manual’s calculator method to estimate reproduction costs for each section. He also employed this method for the minor improvements. For the various yard improvements, the reproduction cost was estimated by using in-place square foot, linear foot or quantity unit prices. Sullivan indicated that he used his experience and judgment in his determination that the subject improvements fit the basic classification of a “Class C” building as depicted in the manual’s comparative calculator method and that the condition and quality of construction of the subject was good. Thereafter, he followed the dictates of the manual.
The allowances for physical depreciation. set forth in the manual’s tables were followed except, according to defendant’s expert, Scrivens, for some minor adjustment with regard to the office area. In any event, Scrivens clearly indicated that physical depreciation was measured by direct reference to the depreciation tables in the manual.
With regard to any other forms of depreciation, Scrivens indicated that no allowance was made for either functional or economic (now termed external) obsolescence.
Initially, defendant’s appraisal report set forth a reproduction cost value of $30,724,800. At trial Sullivan indicated that this figure was not correct because it did not properly reflect cost as of the assessment date of October 1, 1982. He, therefore, applied a cost multiplier which reduced the overall estimate of value including land to $28,318,140. Subsequently on cross-examination he agreed that he had applied an incorrect life expectancy classification and therefore the physical depreciation allowances were incorrect. In reviewing the appropriate classification and depreciation table in the manual he adjusted all of the depreciation estimates in exact accordance with the *629 allowances set forth in the manual. This reduced the overall value of the subject including land to $25,982,250.
This court has accepted the cost approach using the Marshall Valuation manual on a number of occasions, see ITT Cont’l Baking Co. v. East Brunswick Tp., supra and Pennwalt Corp. v. Holmdel Tp., supra, essentially on the basis that the proofs adduced in support of the method were reliable. Here the supporting proofs are lacking and further I am not convinced by the appropriate standard of proof, that the method, as applied by defendant’s experts, provides a credible estimation of fair market value for the subject.
To begin with, there was some question with regard to the proper application of the base cost for office space (40,940 square feet of office space) as found in the manual. It was not clear whether Sullivan had used a higher base cost for office space than should have been pursuant to the instructions of the manual. In any event, based on the record I am not convinced by the appropriate standard of proof that Sullivan’t application in this regard was correct.
Further, and more significantly, I find that the only support for the physical depreciation estimates by defendant’s experts were the depreciation tables in the Marshall and Swift manual. No nationally standardized table or chart, however derived, can effectively replace an appraiser’s justification of accrued depreciation in a particular property based upon market data, observation, experience and explicable analysis and calculation. The ease with which Sullivan changed his estimate of value by $2,335,900 based on the depreciation tables alone demonstrates the care with which the cost approach must be used and indicates that one should hesitate to accept its value conclusion without checking it against all relevant data. I am not convinced that defendant’s estimate of physical depreciation was appropriately derived and supported in this case.
In addition to physical depreciation I am not convinced that defendant’s appraisal experts properly handled the question of functional obsolescence in this case.
*630 On the issue of functional obsolescence, defendant asserts that the taxpayer has the burden of proof, citing RCA Corp. v. East Windsor Tp., 1 N.J.Tax 481 (Tax Ct.1980). This is wide of the mark. In RCA Corp. it was the taxpayer who, in its affirmative case for a reduction in assessment contended that there was functional inutility present in its facility.[4] Here, it is the taxing district, in seeking an increase in assessment in its affirmative case, who asserts that there is no functional obsolescence and who must carry the burden of that assertion. See Evid. R. 1(4) (Anno.1985) Comment 2 (The party asserting a claim has the burden to prove it). This is especially true in this case in light of the age of the subject improvement.
The only basis for not allowing any functional obsolescence as set forth by Scrivens was that the subject building was completely utilized by the present owner-user. Scrivens was of the opinion that if the owner needed a building it would produce that which it had without change. This is unsupported in the present record for two reasons. First, there was no showing that the building was ideal even for the present owner’s needs. The question which must be answered is would the plaintiff (or any other manufacturer producing the same products as plaintiff) if it needed a new building to house its current manufacturing process reproduce exactly what it had constructed in stages in 1951, 1953 and 1967 to accommodate other manufacturing processes. There are no proofs to support an affirmative answer, hence, no support for the assertion that there is no functional inutility even considering plaintiff’s particular use. On the contrary, based on the age of the subject a conclusion that there is functional obsolescence would appear to be in order.
*631 Secondly, there is some question as to whether defendant’s valuation constitutes value in use or value to a particular owner rather than value in exchange as required by N.J.S.A. 54:4-23. Although defendant denies that its expert followed a value in use methodology the record indicates that Scrivens was influenced by the value to the present owner in its present manufacturing use (or to a potential purchaser with the exact requirements of the owner).
I have previously stated that the proofs in this case support the conclusion that the highest and best use of the subject property is a general-purpose manufacturing-warehouse facility not specifically limited to plaintiffs particular manufacturing process. As such, it can be compared to other such facilities or current construction methods to determine if functional inutility exists. This was not done in this case by defendant’s experts because they opt. .rated under the premise that plaintiff’s particular use was the highest and best use of the subject building.
For the reasons heretofore stated I conclude that neither party in this case sustained its requisite burden of proof by a fair preponderance of the evidence. This court is mindful of its obligation to apply its knowledge and expertise, see Glen Wall v. Wall Tp. supra, to the valuation data submitted by the experts and to ascertain and determine the true value of the subject property. But this can only be accomplished when there is enough substantial and competent evidence to enable the trier of the facts to determine true value. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 74, 208 A.2d 153 (App.Div.1965).
In this case I find that I cannot accept the opinion of either plaintiff’s expert or that of defendant’s experts as providing a correct estimate of the value of the subject property nor can I make adjustments to the valuation data submitted to enable the court to ascertain and determine the true value of the subject as set forth in Samuel Hird & Sons. Ibid.
Therefore, I direct the Clerk of the Tax Court to dismiss plaintiff’s complaint and defendant’s complaint both for failure *632 to sustain the requisite burden of proof necessary to alter the original assessment on the plaintiff’s case and the judgment of the Middlesex County Board of Taxation on the defendant’s case.

 Special purpose property has been defined as, "a property devoted to or available for utilization for a special purpose, such as a clubhouse, a church property, a public museum, a public school, etc. It also includes other buildings having value, such as hospitals, theatres, breweries, etc., which cannot he converted to other uses without large capital investmentBoyce, Real Estate Appraisal Terminology (1981) at 226; emphasis supplied.

 Whole property comparison involves a single lump sum adjustment based on a narration indicating why and to what extent the property being appraised is considered better or poorer than a comparable sale property. The estimated effect on value is presented as a single figure with no allocation in terms of the specific effect of particular factors contributing to the total. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978), at 286. Kilpatrick denied that he utilized a whole property comparison technique. But it appears that based on the definition of the technique that that is essentially what he did.

Kilpatrick at the outset of his testimony indicated that industrial-warehouse facilities can be categorized by size as to potential markets as follows:
1) up to 50,000 square feet
2) 50,000 to 100,000 square feet
3) 100,000 to 250,000 square feet
4) 250,000 to 500,000 square feet
5) 500,000 to 1,000,000 square feet
Kilpatrick observed that the pool of potential purchasers diminishes as the size of the industrial facility increases. Normally a user for one category would not be interested in another category.

 SimiIarIy, in CPC Int'l v. Englewood Cliffs, 193 N.J.Super. 261, 267, 473 A.2d 548 (App.Div.1984) the Appellate Division stated that the taxpayer had the burden of proof on the issue of functional obsolescence but this again was with regard to taxpayer’s affirmative case for a reduction in assessment. The CPC Int’l court concluded that there was no functional obsolescence since there was nothing in the record to demonstrate any such functional impairment. Ibid.