CRABTREE, J.T.C.
This is a local property tax case wherein plaintiff seeks direct review of the 1992 assessment on its property located at 50 Central Avenue, Kearny, New Jersey (Block 288, Lots 1, 2, 3 and ' 3R, a single line item). That assessment was:
Land $1,899,500
Improvements 3,670,500
Total $5,570,000
At issue are the true value of the subject property, and whether plaintiff is entitled to statutory relief from a discriminatory assessment, pursuant to N.J.S.A 54:51A-6 (chapter 123 in the Tax Court). At the heart of the valuation issue is whether the property’s value has been adversely impacted by environmental contamination attributable to plaintiffs discharge of chemical wastes into the ground over a long period of years. See Inmar Assoc., Inc. v. Carlstadt Boro., 112 N.J. 593, 549 A.2d 38 (1988).
*208 The subject of the controversy is an owner-occupied chemical plant heretofore engaged in the manufacture of plasticizers. See Badische Corp. v. Kearny, 11 N.J.Tax 385 (Tax 1990). On the valuation date the property was comprised of 27 buildings containing 147,787 square feet, constructed over a 78-year period from 1910 to 1988. The improvements are situated on 27.136 acres.
Plaintiff has operated at the subject site since the mid-1960s. It ceased operations at the facility in 1990, giving notice thereof to the New Jersey Department of Environmental Protection, now the Department of Environmental Protection and Energy (DEPE)[1] in June of that year. Operations were formally terminated in September 1990.
As the nature of the manufacturing process at the site involved hazardous chemicals, the plant constituted an industrial establishment, as defined in N.J.S.A. 13:lK-8(f), part of the Environmental Cleanup Responsibility Act (ECRA), N.J.S.A 13:lK-6, et seq. As provided in N.J.S.A. 13:lK-9, the plant closure triggered the application of ECRA. Pursuant thereto, plaintiff filed a General Information Submission (GIS), followed by a Site Evaluation Submission (SES), in accordance with N.JAC. 7:26B-1.6 and N.JAC. 7:26B-3.2. The SES, which was filed with the DEPE in August 1990, set forth the copious detail required by N.JAC. 7:26B-3.2(c), including site history, spill records, explanation of operations, permits, and history of enforcement actions.
The SES included a sampling plan required by N.JAC. 7:26B-3.2(c)(ll). That plan contained the details for the characterization of the contamination present at the site. The purpose of the plan was to establish the approach for investigating the nature and extent of contamination. Through the sampling plan, plaintiff set out, first, to ascertain the types of contamination present and, secondly, to ascertain the vertical and horizontal extent of contamination. In response to the DEP’s conditions and comments about *209 the sampling plan, plaintiff submitted an addendum thereto in January 1991, incorporating, inter alia, another sampling plan. The addendum clarified the investigative approach on 13 of the 24 areas of environmental concern identified in the initial sampling plan. Plaintiff also submitted a decommissioning plan to the DEP on January 7,1991. This plan involved asbestos removal, building and equipment decontamination, site restoration and final disposal of wastes. A contract for the decommissioning was awarded to a Princeton, New Jersey, firm in May 1991 for $5.4 million dollars, an amount which was part fixed and part variable. Plaintiff estimated that, as of October 1, 1991, the total decommissioning cost would be $5.4 million. As it turned out, the total cost was only $3,000,000. The work was completed in December 1992. The reports hereinabove described, as well as others, were prepared for plaintiff under the guidance of O’Brien & Gere Engineers, Inc., an environmental consulting firm. The submissions were made to the DEP and the DEPE, in some instances by the latter, in other instances by Dale Webster, plaintiffs manager of site remediation.
Among the reports submitted by O’Brien & Gere was the Phase I Sampling Report/Phase II Sampling Plan. This document, submitted to the DEPE on November 15, 1991, identified the areas of concern in soil and groundwater and provided the first estimate of the vertical and horizontal extent of contaminants in the soil and groundwater. The report also contained scientific data addressing the vertical contamination of the property in October 1991. As of May 11, 1993, the date of trial, the report was still under review by the DEPE.
Plaintiff, assisted by O’Brien & Gere, concluded that the appropriate technology to be utilized in cleaning up the site (in addition to the work done under the decommissioning contract) was “low temperature thermal desorption,” a process whereby soils are excavated and placed in a burner unit to volatilize the contaminants, which are then combusted into a secondary chamber and the clean soils then returned to the excavation. The estimated cost was $10,000,000, an amount set up as a reserve on plaintiffs *210 books in November 1990. The estimate was derived from plaintiffs experience with other sites around the United States and Canada and other superfund sites; it was also consistent with plaintiffs understanding of remediation technologies and familiarity with DEPE requirements.
No cleanup plan had been filed with DEPE by May 11, 1993, the date of trial. Webster estimated that negotiations with DEPE would ensue once a cleanup plan was submitted. He did not expect DEPE approval of a cleanup plan before 1994.
Except for the decommissioning, no contract had been awarded for the cleanup by the trial date.
The DEPE has not advised plaintiff of the levels of cleanup to be required at the subject site.
Plaintiffs valuation expert estimated the true value of the subject property, before allowance for environmental contamination, at $3,725,000. In developing this estimate, he relied exclu-' sively upon the cost approach. As he did in the earlier ease involving tax year 1988, he utilized the Marshall Valuation Service (Marshall), choosing Class C average for the quality of construction. Under this analysis, he calculated reproduction cost new (RCN) for the 27 buildings at $7,665,537. He estimated the RCN for two smaller structures at $1,291,696, RCN for tanks and site improvements at $2,929,843 and $1,024,952, respectively. He ascribed physical depreciation for the buildings, which ranged in age from four to 81 years, of 60% on a weighted basis. He estimated depreciation for the relatively short-lived tanks, at 92% and for the remaining structures and site improvements at 78%. The depreciated improvement values, before economic obsolescence, were thus calculated to be $3,832,553.
The expert, ostensibly relying upon what he viewed as the parlous state of the industry, the level of plaintiffs economic performance and a hostile regulatory climate, estimated economic obsolescence at approximately 32%, reducing his estimated improvement value to $1,008,724, rounded to $1,010,000.
*211 The expert estimated the land value at $2,715,000 on the basis of six allegedly comparable land sales.
The expert thus arrived at a final value, under the cost approach, of $3,725,000, assuming the property to be clean and uncontaminated.
He also estimated the property to have a negative value of ($8,925,000), taking into account its contaminated condition. In arriving at this startling conclusion, he projected total cleanup expenditures over a ten-year period at $15,296,000, of which $5,296,000 represented decommissioning and decontamination costs, to be expended in one year, and $10,000,000 in site cleanup costs to be expended over nine years. He also assigned a reversionary value of $2,715,000 to the property at the end of the cleanup period. In developing the negative present value of $8,925,000, he utilized the discounted cash flow (DCF) approach with a 10% discount assumption and an assumed 5% annual increase in land value. He also assumed that no buildings or structures would remain at the end of the cleanup period, as their estimated useful lives would have been exhausted by then, with the salvage value of the improvements offsetting any demolition costs.
The most important issue in this case is the impact of environmental contamination upon the property’s true value for tax purposes. The court will therefore address that issue first.
The analysis of this issue begins with review of some basic principles. First, all property is valued for property tax purposes as though sold under private contract on October 1 of the pretax year. N.J.S.A 54:4-23. New Jersey law thus endorses taxation in accordance with the concept of value in exchange, i.e., value is determined by what a property would likely sell for, not its value in use to the owner.[2] See Ford Motor Co. v. Edison, *212 127 N.J. 290, 302, 604 A.2d 580 (1992); WCI-Westinghouse, Inc. v. Edison Tp., 7 N.J.Tax 610, 616 (Tax 1985), aff'd o.b. per curiam 9 N.J.Tax 86 (App.Div.1986).
Secondly, governmental restraints on use or disposition may affect the value of real property for property tax purposes. See Schwamm v. Cedar Grove Tp., 9 N.J.Tax 406 (Tax 1987), aff'd per curiam 228 N.J.Super. 522, 550 A.2d 502 (App.Div.1988), and cases there cited; Inmar Assoc. Inc. v. Carlstadt Boro., supra, 112 N.J. at 604, 549 A.2d 38.
Thus, the property’s true value for tax purposes must be determined as though it were under a contract of sale on the assessing date. Also, such true value must be determined in light of legislative and regulatory restraints in effect on the valuation date.
On and prior to the relevant valuation date, viz., October 1, 1991, operations at the subject site involved the manufacture, treatment, storage and handling of hazardous substances or wastes. Thus, plaintiff’s chemical plant was an industrial establishment as defined in N.J.S.A 13:lK-8 and was subject to ECRA.[3]
N.J.S.A. 13:lK-9 provides:
a. The owner or operator of an industrial establishment planning to close operations shall:
(1) Notify the department in writing, no more than five days subsequent to public release, of its decision to close operations;
(2) Upon closing operations, or 60 days subsequent to public release of its decision to close or transfer operations, whichever is later, the owner or operator shall *213 submit a negative declaration or a copy of a cleanup plan to the department for approval and a surety bond or other financial security for approval by the department guaranteeing performance of the cleanup in an amount equal to the cost estimate for the cleanup plan.
b. The owner or operator of an industrial establishment planning to sell or transfer operations shall:
(1) Notify the department in writing within five days of the execution of an agreement of sale or any option to purchase;
(2) Submit within 60 days prior to transfer of title a negative declaration to the department for approval, or within 60 days prior to transfer of title, attach a copy of any cleanup plan to the contract or agreement of sale or any option to purchase which may be entered into with respect to the transfer of operations. In the event that any sale or transfer agreements or options have been executed prior to the submission of the plan to the department, the cleanup plan shall be transmitted, by certified mail, prior to the transfer of operations, to all parties to any transaction concerning the transfer of operations, including purchasers, bankruptcy trustees, mortgagees, sureties, and financiers;
(3) Obtain, upon approval of the cleanup plan by the department, a surety bond or other financial security approved by the department guaranteeing performance of the cleanup plan in an amount equal to the cost estimate of the cleanup plan.
c. The cleanup plan and detoxification of the site shall be implemented by the owner or operator, provided that the purchaser, transferee, mortgagee or other party to the transfer may assume that responsibility pursuant to the provisions of this act.
The DEP, in 1989, adopted a regulation prohibiting the sale or transfer of an industrial establishment until the DEP approved a cleanup plan or an ACO was executed. N.J.A.C. 7:26B-5.1.[4]
As indicated above, no cleanup plan has been submitted by plaintiff; obviously, no cleanup plan has been approved by the DEPE; no contract for the cleanup beyond the $5.4 million decommissioning contract has been awarded. The projected cleanup cost of $10,000,000 is merely an estimate which plaintiffs site remediation manager conceded was subject to negotiation with the DEPE.
The basis for the $10,000,000 cleanup estimate, namely, plaintiffs experience with other sites in North America, and with superfund sites, lacks probative value. Stephen J. Roland, an *214 employee of O’Brien & Gere, testified that each site has different characteristics and different risk factors, all of which must be taken into account in developing and proposing cleanup standards for the site. He went on to testify that, as of October 1,1991, the DEPE had not disclosed to him or to any other representative of plaintiff the level of cleanup that would be required at the subject site.
Moreover, while N.J.S.A 13:1K-10 directs the DEPE to adopt rules and regulations establishing minimum standards for soil, groundwater and surface water quality necessary for detoxification of an industrial establishment and to establish criteria for evaluation and approval of cleanup plans, no such rules, regulations or criteria had been adopted by May 11, 1993, the date of trial. In this connection, the DEPE, in a regulation adopted prior to October 1, 1991, and unchanged by the trial date, declared:
Until adoption of the minimum standards required pursuant to Section 5(a) of the Act, N.J.S.A 13:1K-10, the Department shall review, approve or disapprove negative declarations and cleanup plans on a case-by-case basis for soil, ground water and surface water quality necessary for the cleanup of the industrial establishment, including building and equipment, to ensure that the potential for harm to public health and the environment is minimized to the maximum extent practicable, taking into consideration the location of the industrial establishment, surrounding ambient conditions, and other relevant factors.
[N.J.AC. 7:26B-11.1J
In sum, cleanup or detoxification of a contaminated industrial establishment is site specific and its costs cannot be estimated on the basis of cleanup costs incurred elsewhere. In the Inmar case, supra, the Tax Court, in an unreported opinion,[5] had denied GAF Corporation’s claim for reduction in value for cleanup costs of its South Bound Brook asphalt plant because GAF’s estimate of cleanup costs was merely a rough estimate based on an inspection of the property but without a sampling study. The Tax Court, which also pointed to the lack of evidence of a cleanup plan approved by DEP, found GAF’s estimate to be an insufficient *215 quantification of the effect of ECRA cleanup requirements on the market value of the property. The Appellate Division affirmed the Tax Court, as did the Supreme Court, the latter observing at p. 609 of 112 N.J.:
In applying these principles to the facts of these cases, we are satisfied that the judgment in the South Bound Brook case should stand. Although the Tax Court did not resolve the methodology for assessing the effect of ECRA requirements, it found the data offered an unsatisfactory base for such an adjustment. There was otherwise no apparent flaw in the assessor’s methodology. The parties had stipulated the value of the property that was in use as of the assessment date.
The case before this court is indistinguishable from the GAF case. Here, while there was a sampling plan, incomplete though it was, there was no cleanup plan even submitted to DEPE, much less approved by that agency. The $10,000,000 cleanup reserve was not supported by evidence of the actual cleanup costs to be incurred at the subject site.
The estimate of $5,296,000 for decommissioning expenses as an element of cleanup costs affecting the property’s true value is likewise not probative. First, the expense pertained to building decontamination pursuant to plaintiff’s voluntary cessation of business, not to environmental cleanup of soil and groundwater. Second, the estimate, even at the time the decommissioning contract was signed, was a mere projection including variable expenses; the actual cost was $3,000,000. This amount, however, was not known or even reasonably anticipated until work under the contract was completed in December 1992, fifteen months after the valuation date. As a post-assessing date event, the court does not consider it in determining true value. Fort Lee v. Invesco Holding Corp., 3 N.J.Tax 332 (Tax 1981), aff'd, 6 N.J.Tax 255 (App. Div.), certif. denied, 94 N.J. 606, 468 A.2d 238 (1983). Thirdly, while the decommissioning contract involved asbestos removal, the costs of which may be considered in determining true value of property involved in a tax valuation proceeding, University Plaza Realty Corp. v. Hackensack, 12 N.J.Tax 354 (Tax 1992), aff'd 264 N.J.Super. 353, 624 A.2d 1000 (App.Div.), certif. denied, 134 N.J. *216 481, 634 A.2d 527 (1993), the proofs do not identify or segregate the amount to be spent for asbestos removal.[6]
In view of the foregoing, the court concludes that plaintiff has failed to establish all the cleanup costs attributable to the subject site, and thus its expert’s opinion of value based upon cleanup costs is rejected. The probative utility of an expert’s opinion stands or falls on the facts offered in support of the opinion. Dworman v. Tinton Falls, 1 N.J.Tax 445 (Tax 1980), aff'd o.b. per curiam, 3 N.J.Tax 1, 434 A.2d 1134 (App.Div.1981); Kearny Leasing Corp. v. Kearny, 6 N.J.Tax 363 (Tax 1984), aff'd o.b. per curiam, 7 N.J.Tax 665 (App.Div.1985); Biunno, Current N.J. Rules of Evidence, comment on Evid.R. 703 (1993-4).
Although the expert’s cost approach stands unrebutted by contrary evidence, it is still incumbent upon this court to evaluate the probative utility of the expert’s value estimate.
 To begin with, his land value estimate of $100,000 per acre is flawed by his use of three land sales involving little more than 11% of the subject’s acreage. He adjusts one of these sales 30% for size but makes no size adjustment for the other two sales, even though the sale which he adjusts by 30% involved 3.376 acres, while the other two sales, unadjusted for size, involved 3.256 acres and 4.756 acres. I find that the size difference between those three comparables and the subject vitiates comparability. This leaves three sales with adjusted sale prices per acre of $113,199, $104,271 and $111,715. As to these sales, I find the expert’s adjustment for utility is subjective and not supported by hard data. Thus, I find the adjusted price per acre of those three sales (#1, #2 and # 6) to be $123,700 for Sale # 1, $126,270 for Sale # 2 and $143,633 for Sale # 6. On the basis of these three *217 comparable land sales, I find the land value for the subject to be $130,000 per acre.
Accordingly, I find the land value to be $3,527,700 ($130,000 x 27.136 acres, rounded).
Secondly, I find from the. expert’s testimony that his estimate of economic obsolescence was influenced by the decision of plaintiffs management to close the plant. Also, he based his adjustment for economic obsolescence on the fact, unsupported by the credible evidence, that plaintiff had been losing money for some years prior to the valuation date. Finally, the expert failed to support his estimate of economic obsolescence by capitalized rent loss or by comparing sales of similar properties that were subject to the negative influence with those that were not. See Appraisal Institute, The Appraisal of Real Estate, 358 (10th ed. 1992).
Accordingly, I reject the expert’s adjustment for external obsolescence.
The balance of the expert’s cost approach is credible, and I therefore accept it as probative of the improvement value on the assessing date.
In view of the foregoing, I find the true value of the subject property on October 1, 1991, to be $7,360,200, calculated as follows:
Land — 27.136 acres x $130,000 $3,527,700
Depreciated value of all improvements, structures, tankage and site improvements 3,832,553
Total $7,360,253
ROUNDED $7,360,200
The general average ratio, determined by the Director, Division of Taxation, for defendant-taxing district for tax year 1992 was 53.77%; the upper and lower limits of the common level range were, respectively, 61.84% and 45.70%. The ratio of the 1992 assessment to the property’s true value as herein found is 75.68%, *218 which exceeds the upper limit of the common level range. Plaintiff is therefore entitled to relief under N.J.S.A. 54:51A-6(a) by application of the general average ratio of 53.77% to the true value.
Judgment will be entered indicating the assessment to be as follows:
Land $1,345,600
Improvements 2,612,000
Total $3,957,600

 The Department of Environmental Protection was redesignated the Department of Environmental Protection and Energy by Reorganization Plan No. 002-1991, issued by Governor Florio on June 20, 1991.

 The Supreme Court observed, in the Inmar case, supra, that the GAF property in South Bound Brook had a distinct value in use to the owner, so long as the owner continued to operate the facility. 112 N.J. at 607, 549 A.2d 38. *212 Thus, when property is in use, the court continued, normal assessment techniques will remain "an appropriate tool in the appraisal process." Id. Those observations are not germane in the instant case, as the property was no longer in use by the valuation date.

 Legislation governing the cleanup and disposition of environmentally contaminated industrial establishments was substantially amended by the Industrial Site Recovery Act (ISRA), L. 1993, c. 139, effective June 16, 1993. The amendatory legislation is not applicable to this case, as the effective date was subsequent to the valuation date involved here.

 An ACO is an Administrative Consent Order, the criteria for the issuance of which are set forth in N.J.A.C. 7:26B-7.1. None of those criteria is applicable in this case.

 The Inmar case involved two appeals: Inmar Assoc., Inc. v. Carlstadt and GAF Corp. v. South Bound Brook. Inmar was reversed and remanded to the Tax Court; the Tax Court’s decision in GAF was affirmed. 112 N.J. at 610, 549 A.2d 38.

 In addition, I note, in passing, that the Supreme Court in Inmar declared that cost is not invariably equated with value.
112 N.J. at 602, 549 A.2d 38. Thus, the property's true value is not necessarily reduced dollar-for-dollar by the decommissioning costs or, for that matter, the DEPE-mandated cleanup costs. In any event, for the reasons hereinabove stated, the evidence is insufficient to establish those costs.