TAX COURT OF NEW JERSEY



**Kathi F. Fiamingo**
**Judge**

**120 High Street**
**Mount Holly, NJ 08060**
**Tel: (609) 288-9500 EXT 38303**

NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

October 16, 2017

Michael Rienzi, Esq.
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

Anthony Marchese, Esq.
Chiesa Shahinian & Giantomasi PC
One Boland Drive
West Orange, NJ 07052

  Re: Robert J. O'Shea and Michele K. O'Shea v. Wyckoff Township
    Docket Nos. 006761-2012, 000121-2014, 008317-2015
    677 Charnwood Drive, LLC v. Wyckoff Township
    Docket No. 004793-2016

Counsel:

  This letter constitutes the court's opinion after trial in the above-referenced matter challenging the 2012, 2014, 2015 and 2016 tax year assessments on plaintiffs' single-family residence. The 2013 tax year assessment was not appealed. After reviewing the evidence presented, the court finds that both plaintiffs' and defendant's sales approaches are unreliable and must be rejected. The court further rejects defendant's cost approach for the reasons more fully expressed herein. The subject property, while high-end with many extraordinary features, is not so opulent or grand that comparable sales are nonexistent and thus the court rejects defendant's argument that the sales approach is inapplicable and only the cost approach may be applied.

Neither party presented evidence sufficient to demonstrate that the assessments under review were erroneous. As a result, the assessments for each of the years under review are affirmed and plaintiffs' complaints are dismissed.

## I. Procedural History and Factual Findings

The court makes the following findings of fact and conclusions of law based on the evidence and testimony offered at trial in this matter.

Robert J. O'Shea and Michele K. O'Shea were the owners of a single-family residence located at 677 Charnwood Drive, Township of Wyckoff, County of Bergen and State of New Jersey for tax years 2012 through 2015. The property is identified on the tax map of the Township of Wyckoff as Block 421, Lot 72.01 (the "subject property"). In 2016, the subject property was owned by 677 Charnwood Drive, LLC, a limited liability of which Robert and Michele O'Shea were the sole owners. The O'Sheas and 677 Charnwood Drive LLC will be referred to herein collectively as plaintiffs.

The subject property consists of 1.80 acres and the improvements described herein. Prior to 2009 the O'Sheas purchased three building lots, one of which was improved with a partially built residence. After purchasing the lots, the O'Sheas applied for and received approval to reverse the previously granted subdivision in order to combine the three lots into one building lot. The O'Sheas demolished the partially constructed residence and built the residence currently existing on the subject property.

The subject property is located at the end of a cul-de-sac, adjacent to a now closed golf course, which is scheduled for development into 275 dwelling units including both single family and town home units. The subject property is located at the southwestern most corner of Wyckoff, adjacent to Franklin Lakes.

The completed improvement consists of a 12,407 square foot single-family residence (exclusive of the basement area) completed in 2009. The first floor of the home features a two-story foyer with a domed, stained glass ceiling, a dining room and first floor den/office, both with coffered ceilings, kitchen and breakfast nook with tray ceilings, butler's pantry including a wine closet and service sink, great room/family room, entertainment room with beamed ceiling, game and billiards room, mud room, laundry room, and storage room. The second floor contains the master bedroom suite with office area, master bathroom and his and her walk-in closets, four additional bedrooms, second laundry room, and "meditation" room. On the third floor, there is a 712 square foot home theatre. The basement contains an additional 5,121 square feet of finished space featuring a gym, entertainment rooms, temperature controlled wine cellar, and the mechanicals for the home, including state-of-the-art "smart" technology. The main home includes seven full bathrooms and three half bathrooms. Attached to the main house is a three-car garage and porte-cochere for a fourth vehicle. In addition, the grounds include a tennis court, an infinity pool and a pool house/cabana containing a full kitchen and full bathroom and sitting/entertainment area. The pool is surrounded by a stone/paved lounge area, including a grill area and several seating areas. The grounds are well appointed with manicured landscaping. The driveway and parking areas feature patterned paving materials. The home has many luxury features and is finished with high-end materials throughout.

For the 2012 tax year, the subject property was assessed as follows:

| Land: | 1,812,500 |
|---|---|
| Improvements: | 8,449,800 |
| Total | 10,262,300 |

For the 2014 tax year, the subject property was assessed as follows:

| Land: | 1,812,500 |
|---|---|
| Improvements: | 4,187,500 |
| Total | 6,000,000 |

The Township of Wyckoff engaged in a revaluation for tax year 2015. As a result of that revaluation, the assessment for tax years 2015 and 2016 was:

| | |
|---|---|
| Land: | 2,118,800 |
| Improvements: | 4,006,300 |
| Total | 6,125,100 |

Plaintiff timely filed Complaints in the Tax Court challenging the assessments on the subject property. The municipality did not file counterclaims in any of the years. The matters were tried to conclusion. Each party offered the testimony of a State of New Jersey certified general real estate appraiser, both of whom were accepted without objection as experts in the field of real estate valuation (the "plaintiff's expert" and the "defendant's expert" respectively). Both experts prepared an appraisal report, which were each admitted into evidence without objection.

The experts' conclusions as to value were as follows:

| Value Date | Plaintiffs' Conclusion | Defendant's Conclusion |
|---|---|---|
| October 1, 2011 | $3,500,000 | $11,605,000 |
| October 1, 2013 | $3,250,000 | $11,809,000 |
| October 1, 2014 | $3,000,000 | $11,863,000 |
| October 1, 2015 | $3,000,000 | $11,840,000 |

Plaintiffs also offered testimony from the Township of Wyckoff Tax Assessor.

## II.    Plaintiffs' Valuation Evidence

Plaintiff first called the municipal assessor as a fact witness. The assessor indicated that, in general, the homes on Charnwood Drive are very well built and well appointed, averaging approximately 4,000 to 5,000 square feet. There are approximately one dozen homes in the neighborhood in excess of 5,000 square feet. The assessor testified that the 2012 assessment for the subject property was based on the cost approach; the 2014 assessment was reduced because of a "negotiated settlement" in which the assessor did not participate. The 2015 assessment was set

4

as a result of a revaluation performed by Realty Appraisal Company, which was carried forward for the 2016 tax year.

Plaintiff's expert testified that he personally inspected the subject property. He described the home as an 11,867 square foot single family residence with five bedrooms, seven full baths and three powder rooms. He remarked that in looking at hundreds of sales in the surrounding area, his research showed that "at a certain point in this market, it just becomes a large home." Thus, in his opinion, the subject property is a five-bedroom home that is approximately 12,000 square feet. Although there is a lot of square footage, there are "not a lot of rooms." He acknowledged that the property owner spent a lot of money constructing the home and that it was a beautiful home, however, he determined that the subject property and its amenities were "pretty typical" of the market. He noted that the third floor was essentially a 700 square foot finished attic containing the media room; a feature he contended was included in all of the comparable sales he reviewed. He described the second floor as containing five bedrooms and a playroom/yoga room. The expert noted there was a finished basement which was similar to comparable properties, with a basement wine cellar. He further noted the tennis court, the in-ground pool and the cabana. The expert testified that in the area the amenities, such as swimming pools, wine cellars, media rooms and home offices were "typical".

He described the extensive landscaping as not an amenity, but more like a "cost to cure" to limit the noise from Sycomac Avenue, and to shelter the subject property from the adjacent golf course.

The expert concluded that the highest and best use of the subject property was its current use as a single family home. After considering the three approaches to valuation (sales approach, income approach and the cost approach), he concluded that the most appropriate valuation method was the sales comparison approach. He deemed the cost approach not applicable because it was

not used by market participants of single family homes and because "[r]egardless of how much the property owner paid for the land and his costs to improve the property . . . cost does not equate to value." He acknowledged that the plaintiffs purchased the land upon which the home was built for $4,000,000 and spent approximately $7,000,000 to construct the home, however, in the expert's opinion the property was "over-improved." The expert deemed the sales approach the most reliable method to find market value.

In choosing his comparables for the sales approach, the expert testified that he used a combination of the Garden State Multiple Listing Service (GSMLS), the New Jersey Multiple Listing Service (NJMLS) and a number of other data sources to identify potential sales. He also "Googled" the sale of high-end homes in the area and various realtor sites and correlated them with the listing services he identified.

The expert testified that he did not consider any sales of homes under 7,000 square feet. He also determined that at the point of homes of 8,000 to 10,000 square feet, the "market stops looking at the size" and instead looks at the number of bedrooms and bathrooms. That is, a buyer will not pay more for a home simply because the rooms the buyer wants are "larger". Furthermore, where there is an excess of bedrooms and bathrooms, they too will be overlooked. According to the expert, the market looks at amenities offered in high-end homes, however, in this regard, it will not reward the inclusion of excess amenities. The expert also testified that the market will reward a large lot, but the larger homes are on approximately 2-acre lots so that the subject property was compliant with that observation.

The expert testified that he verified each of the comparable sales with a participant in the transaction. He also inspected the exterior of each comparable sale property. He was unable to inspect the interior of the comparable sales properties, but reviewed pictures of the interiors which were used in marketing them.

6

<u>October 1, 2011 Valuation Date</u>

The expert searched for sales of single family detached residences containing more than 7,000 square feet of gross living area in Wyckoff and "Comparable Municipalities" built within ten years of the valuation date which sold within 12 months of the valuation date. The expert located sales of property in Wyckoff in the time period, but disregarded them because the homes were 5,000 to 6,000 square feet and he determined that they were not truly comparable. After an extensive search, the search parameters were adjusted to include residences under 10,000 square feet and more than 10 years old. The expert identified four sales, all in Saddle River, as comparable sales for the 2012 Tax Year.

These properties ranged in size from approximately 8,400 square feet to 10,000 square feet. Each of the homes had at least six bedrooms and with the exception of comparable sale two, had amenities which the expert felt were comparable to that of the subject property (for example, theatres, gyms, wine cellars, pools). The expert made a downward adjustment of 10% to each of the comparable sales due to their location in Saddle River. In addition, the expert made an upward 10% adjustment to comparable sale two to account for its inferior amenities[1]. He made no adjustment for the size or gross living area of any of the comparable sales, although the largest, at 10,000 square feet was still approximately 20% smaller than the subject property and the smallest at 8,382 square feet was approximately 30% smaller than the subject property.

With respect to the location adjustment, the expert testified that the sale prices for homes in Saddle River for all tax years averaged $2,000,000, while the average sale price for homes in

---

[1] Comparable Sale Two at 8,400 square feet was described as having six bedrooms, five full and 2 ½ baths with a four car attached garage. No other amenities were noted.

Wyckoff was $750,000. [2]    Acknowledging the nearly 300% difference in average sales prices between the two communities, he determined that a 10% adjustment was "reasonable."

The expert noted that although comparable sale two did not have similar amenities, it had the higher-end finishes and qualities of the subject property and the 10% adjustment ($365,000) would permit for the addition of amenities. He provided no estimates of costs, nor did he indicate what amenities could be constructed with the adjustment provided.

The unadjusted sales prices for the comparable sales ranged from a low of $3,030,000 to a high of $4,400,000. Although the home commanding the lowest price was built more than two decades prior to the subject property in 1987, the expert made no adjustment for age. The adjusted sales prices ranged from $2,727,000 to $3,960,000. The expert concluded a value of $3,500,000 for the subject property as of October 1, 2011.

October 1, 2013 Valuation Date

For the 2014 tax year, the expert again searched for sales of single family detached residences in Wyckoff and "Comparable Municipalities" of more than 7,000 square feet, built within ten years of the valuation date which sold within 12 months of the valuation date. Again the expert was required to adjust the search parameters to include residences under 10,000 square feet and more than 10 years old. The expert identified six sales as comparable sales for the 2014 tax year.

Three of the comparable sales were located in Saddle River and three were located in the adjacent community of Franklin Lakes. Three of the homes contained less than 8,100 square feet. The expert made a positive 5% adjustment for each of these comparable sales to account for their "inferior dwelling size." The expert did not provide any explanation or support for how he reached

---

[2] To support his average sale price determination he provided a grid of Average Residential Sales Price issued by the State of New Jersey Division of Taxation for each of the years under review.

the amount of 5% to account for this adjustment. Nor did the expert explain why these homes at 7,596, 7,834 and 8,097 square feet required a size adjustment, while comparable sale two in the prior year did not require any adjustment at 8,382 square feet. The remaining three comparable sales were similar in size to the subject property (12,000 to 12,600 square feet).

To the three comparable sales located in Saddle River, the expert made a negative 10% adjustment based on the average sales prices of Saddle River compared to Wyckoff as he had done in the prior valuation year. To the homes located in Franklin Lakes, the expert made an adjustment of negative 5% to account for the subject's inferior location, explaining that the average sales prices in Franklin Lakes were $1,150,000 to $1,200,000 compared to Wyckoff's average of $750,000. Again, other than referring to the average sales prices for the communities, the expert did not provide any explanation as to how the -5% adjustment was reached.

One of the comparable sale properties contained 4.0 acres, or roughly twice the acreage of the subject property, for which the expert made a negative 5% adjustment. A second comparable sale contained 1.16 acres, for which the expert made a positive 5% adjustment. Other than noting the "superior" or "inferior" lot size as compared to the subject property, the expert provided no basis for determining when the adjustment would be made, or how he arrived at the 5% adjustment. In expressing his opinion, the expert made a 5% adjustment to one of the comparable sales to account for its lack of amenities. The expert provided no explanation or support for this adjustment (in this case $150,000) or how it related the comparable sale's lack of amenities that were featured at the subject property.

The unadjusted sales prices ranged from $3,000,000 to $4,250,000. After the adjustments, the sales prices were $3,040,000 to $4,250,000. However, the expert, considering the sale with the highest sales price as an outlier, found the range from $3,040,000 to $3,510,000 and concluded a value of $3,250,000 as of October 1, 2013.

9

<u>October 1, 2014 Valuation Date</u>

For the 2015 tax year, the expert searched for sales of single family detached residences in Wyckoff and "Comparable Municipalities" of more than 7,000 square feet, built within ten years of the valuation date which sold within 12 months of the valuation date. Again the expert was required to adjust the search parameters to include residences under 10,000 square feet and more than 10 years old. The expert identified five sales as comparable sales for the 2015 tax year. Four were located in Saddle River and one was in Franklin Lakes.

The size of the comparable sales ranged from 7,800 square feet to 9,300 square feet. Each of the comparable sales were adjusted for their location (negative 10% for Saddle River and negative 5% for Franklin Lakes). One comparable located in Saddle River was adjusted by negative 5%, which the expert acknowledged was an error, but which did not affect his overall opinion of value. The two properties containing less than 9,000 square feet[3] were adjusted by 5% for dwelling size. (The remaining comparable sales at 9,018, 9,300 and 9,320 square feet were not adjusted for size.) One comparable sale with 3.15 acres was adjusted by negative 5% for lot size and one with .94 acres was adjusted upwards by 5%. Two of the properties were each adjusted upwards by 5% to account for their inferior amenities.

The unadjusted sales prices ranged from $2,730,000 to $3,780,000. After adjustment the sales prices were $2,457,000, $2,945,000, $3,591,000, $2,970,000 and $3,195,000. The expert opined that the comparable sales with the lowest and highest adjusted sales prices were "outliers" and eliminated them. The range of adjusted sales prices was then $2,945,000 to $3,195,000. The expert reached an opinion of value of $3,000,000.

---

[3] One Comparable sale contained 8,143 square feet and the other had 7,815 square feet. Both were adjusted at 5%.

<u>October 1, 2015 Valuation Date</u>

For the 2016 tax year, the expert searched for sales of single family detached residences in Wyckoff and "Comparable Municipalities" of more than 7,000 square feet, built within ten years of the valuation date which sold within 12 months of the valuation date. Again the expert was required to adjust the search parameters were adjusted to include residences under 10,000 square feet, more than 10 years old. The expert identified five sales as comparable sales for the 2016 tax year, two in Franklin Lakes and three in Saddle River.

The size of the comparable sale properties ranged from 7,800 square feet to 9,500 square feet. The unadjusted sales prices ranged from $2,730,000 to $3,780,000. The expert adjusted for location (negative 10% for Saddle River; negative 5% for Franklin Lakes), dwelling size (positive 5% for a property of 7,800 square feet and 5% for a property of 8,150 square feet[4]), lot size (negative 5% for a lot of 3.15 acres and positive 5% for a lot of 1.05 acres) and positive 5% for a property with inferior amenities. The adjusted sales prices ranged from $2,457,000 to $3,591,000, however, the expert deemed both the high and the low sales as "outliers" and eliminated them. The remaining adjusted sales prices were $2,913,750, $3,087,500 and $3,195,000, upon which the expert determined a value of $3,000,000.

As noted, the expert made certain adjustments based on amenities or the lack thereof. He acknowledged that he had not inspected any of the comparable properties, but relied on the MLS, broker's descriptions and photographs posted on the broker's web sites to determine the existence of the amenities and their quality.[5] He had no firsthand knowledge of any of the interiors of the comparable properties, the quality of the finishes or the amenities.

---

[4] No adjustment for size was made to comparable sales of 9,478, 9,018 and 9,320 square feet.
[5] After objection by the defendant, the expert acknowledged that he did not take any of the photos and was unable to authenticate them, or confirm that the photos were accurate representations of the comparable properties.

On cross-examination, the expert acknowledged that his description of the subject property as an 11,867 square foot home, did not include the basement area. He further acknowledged that he did not measure the property and although he had reviewed the property record card was unaware of what it indicated at the time of his testimony. Although he did not specifically testify as such, it appears that the expert did not include the third floor media room in his calculation of living area because he described it as a "finished attic."

He testified that he did not utilize the cost approach because he believed the market would look at the sales approach in determining value. He opined that the home was typical of other larger homes and that it was very high end, but not opulent. He agreed that the taxpayers had spent "a lot of money" building the subject property, but that the market would not reward overbuilding. He believed that the subject was an over-improvement for the area, although typical of higher end homes. He testified that the $11,000,000 cost to acquire the lot and build the home had no relevance to market value, thus he rejected the cost approach.

The expert recognized that all of the comparable sales included private septic and water for which he had made no adjustment, although the subject property had city sewer and water. He justified the comparability of Saddle River and Wyckoff because a typical buyer of a 12,000 square foot home would not restrict themselves to any one community but would look in a number of communities with the requisite sized home. He did not take into account differences in the tax rates of the other communities in determining comparability. He relied solely on the average home sales published by the Division of Taxation to develop his adjustment.

The expert testified that he did not use any comparable sales in Wyckoff, because he deemed them not comparable to the subject property.

The expert acknowledged that the MLS for comparable sale one for the 2012 tax year, which sold for $4,100,000, indicated that the Seller was "motivated" and that there was a bonus

paid in the event of a quick sale. He testified that he did not believe these circumstances were notable because the sale was exposed to the market and he found nothing to indicate that the property was "dumped" on the market.

He further acknowledged that he believed an 8,300 square foot home was comparable to the subject property at almost 12,000 square feet because it had a similar number of bedrooms. Therefore, he made no adjustment for the additional 4,000 square feet. He provided no specific support for this conclusion, but referenced in general the comparable sales, noting that some of the smaller homes sold for overall prices higher than the larger homes. He concluded that the measure was bedrooms and bathrooms, not the size of the improvement.[6]

Although adjustments were made for homes of approximately 8,100 square feet or less, there was no support provided for the amount of the adjustment (5%) or why the expert adjusted for size at 8,100 square feet and not at 8,400 square feet, or some other size.

The expert was unable to confirm the quality of the amenities of any of the comparable sale properties, as he had not inspected any of the interiors of the comparable sales. He relied upon the photos posted on the broker's web sites or MLS to determine the comparability of finishes and the various amenities. He did not indicate in his testimony that he confirmed the existence or quality of the amenities with any of the transaction participants. Although a number of the comparable sales had been built a decade or more before the subject property, he made no adjustment for the age of the dwelling.

---

[6] Despite this explanation, the expert made the following dwelling size/room count adjustments "to account for their inferior dwelling size when compared to the subject":

| Tax Year | Dwelling Size | Number of Bedrooms | Adjustment |
|---|---|---|---|
| 2014 | 7,834 SF | 6 | 5% |
| 2014 | 8,097 SF | 6 | 5% |
| 2014 | 7,596 SF | 6 | 5% |
| 2015/16 | 8,143 SF | 6 | 5% |
| 2015 | 7,815 SF | 6 | 5% |
| 2016 | 7,811 SF | 6 | 5% |

The expert also acknowledged that there was no support in his report for the amount of the lot size adjustment by 5% or 10%.

### III.     Defendant's Valuation Evidence

In contrast to plaintiff's expert, defendant's expert testified that he determined the value of the subject property using the cost approach.  Similar to the plaintiff's expert he deemed the subject property an over-improvement, completed with features and amenities specific to the needs of the owner.  He emphasized the high quality of the finishes throughout the subject property and continuing to the exterior, noting that the pool was of the highest quality and the "most expensive" available.  The cabana, although not identical to the main home, was finished in high quality finishes.

The expert pointed out that the actual square footage of the living area of the home, based on the architect's calculations taken from the plans filed with the municipality, was some 712 square feet larger than that acknowledged by the plaintiff's expert.  The total living area was actually 12,407 square feet, including the third floor theater, which it appears was not taken into account by the plaintiff's expert.  He also testified that the finished basement area contained an additional 5,121 square footage.

He noted that the walls of the dining room were covered with silk over padding which he deemed "completely unusual", the two-story foyer featured a domed ceiling with "tiffany style" art, and that coffered ceilings were present in the first floor den and dining room.  Additionally, he deemed the house as having special features "almost too numerous to mention", but he specifically pointed out the first grade cabinetry and built-in appliances, first and second floor laundries, 3-car garage and port cochere for a fourth vehicle, third floor home theatre, the gym and exercise rooms, meditation room and study.  In reviewing the photos he had included in his report, he took care to

14

note features that he determined were "unique", "over the top" and "opulent", and that they were particular to the specifications, needs and desires of the plaintiffs.

Defendant's expert in performing his valuation determined that the highest and best use of the subject property was as the "existing residence." He reviewed all three approaches to valuation, that is, the cost approach, the sales comparison approach and the income approach. He opined that because the sales comparison approach "relies upon subjective adjustments and comparable selection . . . it will wipe out much of the unique attributes of the subject because they are not universally desired or willingly paid for." In the expert's opinion, such features may be used to quantify "incurable functional obsolescence" but such matters are "irrelevant to a NJ Tax Court valuation." Defendant's expert found only the cost approach would provide a reasonable and realistic estimate of the market value of the subject property "for the Tax Court."

In obtaining the land value component of his cost approach, defendant's expert reviewed six sales of land in Wyckoff, including the subject sale. The sales prices ranged from a low of $27.77 PSF to a high of $40.81 PSF. With respect to the subject sale, the expert indicated that it had occurred about 5 years prior to the earliest valuation date and that he would normally note the sale and look for more current sales, but since the subject site is the "largest single-family residential site in Wyckoff and is essentially a unique tract of land," he started his analysis and site valuation with the subject sale.

In doing so, he acknowledged that the site was comprised of three building lots which had been purchased for an aggregate purchase price of $4,000,000. Immediately after purchase, the plaintiffs pursued approval to "reverse" the subdivision and to obtain permits to develop the site as a single-building site. As a result, according to the expert, 2/3 of the value of the site was destroyed, and

> [e]ssentially the $4,000,000 purchase price was reduced in value by 66% to $1,320,000, and the surplus land would only add back 50% of the lost value of

15

$1,340,000 ($2,680,000 x 50%). Indicating that the purchase and rollback of the sub-division became a value estimate of $2,660,000.

He concluded that the subject site was a comparable sale to the subject at $2,660,000. He thereafter adjusted the remaining five sales for location and size. Two of the comparable sales were adjusted upward by 5% to account for the subject's superior location, one because it was located on a street with more traffic, and one for being located on a street without public sewer. The expert did not provide any explanation of how the 5% adjustment for these differences was obtained.

All of the other five comparable sales were adjusted by 20% to account for the subject's superior size. The subject site was approximately three times larger than each of the five other sales being reviewed. The expert did not explain how the adjustment of 20% to account for the lot size was obtained. The adjusted sales price per square foot of the comparable sales were $34.00, $34.90, $51.01, $37.92, $38.56 and $34.71. After consideration, defendant's expert concluded a value per square foot of $35.00 for each of the years under review and reached a market value for the land of $2,738,000.

In obtaining values for the improvements, the expert referenced the Marshall Valuation Service Indices (MVS). For tax year 2012, he calculated the base cost of construction by referencing the MVS cost estimate issued August 2014 for high-value residences, adjusted by a factor to account for "High-Value Heating, Ventilating and Air Conditioning." The expert then adjusted the result obtained by "1% per year" to adjust for the time between the valuation date (10/1/2011) and the August, 2014 cost estimates. The expert provided no study or support for the time adjustment of 3%. The expert did not indicate where he had obtained this adjustment. The expert applied an additional adjustment of 1.32 to the base cost factor to account for the local

16

multiplier from the MVS Local Multiplier table issued October, 2016. After adjustment, the expert arrived at a base construction cost for the home of $7,148,596[7].

For the later years, the expert utilized base cost factors from the MVS tables issued in August, 2016. His report, however, indicates that the August 2014 factors were utilized and he made "time adjustments" as if the August 2014 tables had been utilized. That is the 2014 tax year time adjustment made was 1.0, the 2015 tax year time adjustment made was 1.02 and the 2016 tax year time adjustment made was 1.03. No explanation for this apparent discrepancy was provided, nor is it clear whether such adjustments were inaccurate due to the use of the 2016 factors.

The concluded adjusted base costs for the 2014, 2015 and 2016 were $7,441,469, $7,594,387 and $7664,714, respectively.

The expert then determined the cost of the other improvements and site work, as follows:

Other Improvements and Site Work:

| | | |
|---|---|---|
| Basement: | 5,121 SF x $96.60[8] = | 494,689 |
| Fireplaces: | 10 x $12,500[9] = | 125,000 |
| 3 car Garage | 3 x $8,500 = | 25,500 |
| Port Cochere | 1 x $2,500 = | 2,500 |
| Decks, Porches & Patios | 7,000 SF x $22 | 154,000 |
| Pool | 2,100 SF x $85 x 80%[10] | 142,800 |
| Pool Heater | 1 x $3,000 | 3,000 |
| Cabana/pool house | 650 SF x $300[11] | 195,000 |
| Tennis Court | 4,862 SF x $11.15 x 1.32 | 71,569 |

---

| | | |
|---|---|---|
| [7] First Floor: | 5,205 SF x $599.57 = | $3,120,761 |
| Second Floor: | 6,590 SF x $599.57 x 92% = | 3,635,091 |
| Third Floor: | 712 SF x $599.57 x 92% = | 392,744 |
| | | |
| Adjusted base construction cost | | $7,148,596 |

Per the MVS explanation, for a full height second floor of the same quality and finish as the first, the base cost for the second floor is 92% of the first floor costs.

[8] This factor was the factor for a "Finished, high-value basement" per square foot for the August 2016 MVS Calculator method. Unlike the base cost determination, the expert did not make a "time adjustment" to this factor.

[9] This factor, as well as the factors for the fireplaces, garages, porte cochere, were all obtained from the 2016 MVS tables. No time adjustments or local multiplier adjustments were made.

[10] The data supporting this calculation was not included in the expert's report.

[11] The expert provided no support or explanation for the amount of this adjustment.

17

Driveway and front
Walk                 9,170 x $2.50 +
                               15% x 15 SF                           43,558

Lawn, Shrubs, trees
And retaining wall[12]    50,000 SF x $2.00 + $200,000     300,000

Total added costs                                      $1,557,616

The expert arrived at his final conclusions of value in each of the years as follows:

| Tax Year: | 2012 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Base Costs | $ 7,148,596 | $ 7,441,469 | $ 7,594,387 | $ 7,664,714 |
| Added Costs | 1,557,616 | 1,557,616 | 1,557,616 | 1,557,616 |
| Total | $ 8,706,212 | $ 8,999,085 | $ 9,152,003 | $ 9,222,330 |
| EOH&P[13] @5% | 435,311 | 449,954 | 457,396 | 461,116 |
| Total | $ 9,141,000 | $ 9,449,000 | $ 9,605,000 | $ 9,683,000 |
| Depreciation | x 97% | x 96% | x 95% | x 94% |
| Total | $ 8,867,000 | $ 9,071,000 | $ 9,125,000 | $ 9,102,000 |
| Land Value | $ 2,738,000 | $ 2,738,000 | $ 2,738,000 | $ 2,738,000 |
| Total | $ 11,605,000 | $ 11,809,000 | $ 11,863,000 | $ 11,840,000 |

In applying the adjustment for EOH&P, the expert noted that "entrepreneurial overhead and profit is a market-derived figure that the entrepreneur . . . expects to receive in addition to costs." He provided no market analysis to support the amount of the adjustment, and noted only that the "NJ Tax Court . . . has essentially codified EOH&P at 10% and reducing this in a few cases to 5% for more costly properties."

---

[12] Although the expert included the MVS Yard Improvements cost page in his report, he did not reference it in his calculations. The court is unable to determine from the attachment how the expert determined the per square foot cost or the square footage utilized in determining the improvement.

[13] EOH&P = Entrepreneurial Overhead and Profit

The depreciation factor was obtained using a depreciation table produced by MVS for Residential Properties, assuming a life expectancy of 50 years. The expert determined that the effective age of the improvement as of 10/1/2011 was 3 years, which resulted in a depreciation percentage of 3%. For the valuation as of 10/1/2013, the expert determined an effective age of 4 years, even though two years had elapsed from the 10/1/2011 valuation date, 5 years for 10/1/2014 and 6 years for 10/1/2015. The expert did not explain why the improvements had an effective age of 3 years in 10/1/2011 and 4 years in 10/1/2013.

The expert supplemented his initial report and conclusions by submitting a copy of plaintiff's contract to purchase the land upon which the subject property was built, their construction management contract, and a spreadsheet of payments purporting to reflect the actual payments made by plaintiffs in connection with the construction of the subject property. The supplemental report indicates that the aggregate amount of the cost of acquiring the land and cost of construction was $11,075,087.93, which defendant's expert indicated corroborated his cost approach conclusions. The supplemental report demonstrates that the actual costs incurred, less the purchase price of the land, were $7,075,087.93. As noted above, the undepreciated costs obtained by the expert, excluding EOH&P were approximately $9,000,000 in each year.

After reviewing the cost approach, defendant's expert then reviewed the sales comparison approach to value the subject property. He noted that the unique and luxurious features of the home were unlikely to be "recovered" in an open market sale. He considered these features a

> classic example of super adequacy, and if this assignment were not for use in the NJ Tax Court the correct appraisal methodology would include identification and quantification of the functional obsolescence . . . BUT, that real world situation is not what this assignment entails. The NJ Tax Court expects a valuation that reflects the current use. The valuation should reflect the opulence that the owner(s) sought and paid for and are enjoying.

Thus, the expert opined "[r]eliance on the sales comparison approach to appraise an over-the-top Luxury Mansion in a typical local neighborhood . . . for the NJ Tax Court would render this appraisal incompetent and irrelevant. It is provided herein solely for information."

The expert then identified four comparable sales, all located in Saddle River, with gross living areas ranging from 6,011 square feet to 14,081 square feet, with sale prices ranging from $5,500,000 to $6,500,000. The expert made a negative 10% adjustment to each of the comparable sales for the superior location in Saddle River. Additionally, the expert made a negative 15% adjustment to one comparable sale on a 5.65 acre lot. The only other adjustments made were for age & condition (5% for one property built in 1928 and renovated in 2000; 10% for another built in 1999); and amenities (15% for the "extreme features" of the subject property as compared to the comparable.) No explanation as to the method by which the expert reached any of the adjustment amounts was provided.

The expert concluded an adjusted value of $835 to $438 per square foot and concluded a value of $632 per square foot, resulting in a value for the subject property of $7,754,000 under the sales comparison approach for each of the years under review.

The expert again noted that the concluded valuation under the sales approach "ignored" the NJ Tax Court's requirement that the functional obsolescence of the super-adequacies in the subject property should not be taken into account for "owners who remain in possession and [continue] to enjoy all of the special and somewhat extreme features of their property." He opined that only the cost approach can value the subject property "as required by Case Law in the NJ Tax Court."

IV.     **Conclusions of Law**

a.      **Presumption of Validity**

The court's analysis begins with the well-established principle that "[o]riginal assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW

20

Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). The appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 174 (1952)). The evidence must be "definite, positive and certain in quality and quantity to overcome the presumption." MSGW Real Estate Fund, L.L.C. v. Borough of Mountain Lakes, supra, 18 N.J. Tax at 373.

The court finds that plaintiffs produced sufficient evidence to overcome the presumption of correctness attached to the assessment. If taken as true, plaintiffs' expert and the facts upon which he relied created a debatable question about the correctness of the assessment. Giving the plaintiffs' expert's testimony every positive inference, the court concludes that the presumption of validity has been overcome.

**b.** **Burden of Persuasion**

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that the assessment is erroneous. Once the presumption is overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992). The taxpayer continues to bear the burden of persuading the court that the "judgment under review" is erroneous. Id. at 314-15.

Accordingly, the court will evaluate and weigh the evidence presented to determine if either party has met the requisite burden of persuading the court to make a change in the assessment.

**c. Highest and Best Use**

"For local property tax purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). The determination of the

highest and best use of a property is "the first and most important step in the valuation process." Ford Motor Co. v. Township of Edison, 10 N.J. Tax 153, 161 (Tax 1988).  The highest and best use analysis involves the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive."  Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd 28 N.J. Tax 337 (App. Div. 2015).   Both experts opined that the highest and best use of the subject property was its existing use as a single family residence.  The court accepts the experts' conclusions that the highest and best use of the subject property is its current use as a single family residence.

### d. Methodology

In reaching an opinion of value for the subject property, the two experts employed different approaches.  Plaintiffs' appraiser employed solely the sales comparison approach and defendant's appraiser employed the cost approach and sales comparison approach.

> "There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72, 208 A.2d 153 (App. Div. 1965)); see also ITT Continental Baking Co. v. Township of East Brunswick, 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291, 773 A.2d 1155 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Township, 8 N.J. Tax 169, 176 (Tax 1986) (citing City of New Brunswick v. State Div. Tax Appeals, 39 N.J. 537, 189 A.2d 702 (1963)); see also WCI-Westinghouse, Inc. v. Township of Edison, 7 N.J. Tax, 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986). However, when the proofs submitted in support of one approach overshadow those submitted in support of any other approach, the court may conclude which approach should prevail. See ITT Continental Baking Co., supra, 1 N.J. Tax 244; Pennwalt Corp. v. Township of Holmdel, 4 N.J. Tax 51 (Tax 1982).
>
> [VBV Realty, LLC v. Scotch Plains Tp., 29 N.J. Tax 548, 558-59 (Tax 2017)]

The sales comparison approach derives an opinion of value "by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract." Appraisal Institute, The Appraisal of Real Estate, 377 (14th ed. 2013). The focus of the appraiser is on the "similarities and differences that affect value . . . which may include variations in property rights, financing terms, market conditions, and physical characteristics." Id. at 378. "The market approach (comparable sales) is generally accepted as an appropriate method of estimating value for a residence. Brown v. Borough of Glen Rock, 19 N.J Tax 366, 377 (App.Div.2001). The sales comparison approach is the most common technique for valuing sites, and it is the preferred method when comparable sales are available. Appraisal Institute, The Appraisal of Real Estate, 363 (13th ed. 2008). (See generally GenolaVentures-Shrewsbury v. Borough of Shrewsbury, 2 N.J. Tax 541, 551)" Greenblatt v. Englewood City, 26 N.J. Tax 41, 53 (2010).

However, the courts have recognized that conventional market theories may not be applicable for the valuation of some properties constructed for a special purpose and suited only for such purpose. See e.g., Transcontinental Gas v. Bernards Township (Transcontinental II), 111 N.J. 507 (1988). In such cases, the "cost approach is usually relied upon for property tax valuation purposes." Id. at 527. "In the cost approach, appraisers compare the cost of the subject improvements to the cost to develop similar improvements as evidenced by the cost of construction of substitute properties with the same utility as the subject property." Appraisal of Real Property, supra at 561. "The cost approach may best reflect how the market operates in those circumstances where other 'market' data that is comparable sales or leases are scarce or non-existent." General Motors Corp. v. Linden, 22 N.J. Tax 95, 129 (Tax 2005).

"Special-purpose property is most easily understood in terms of property that 'cannot be converted to other uses without large capital investment,' such as a public museum, a church, or a highly-specialized production facility like a brewery." Ford Motor Co. v. Edison, 127 N.J. 290,

298-99 (1992) (internal citation omitted).     Defendant does not contend that the subject property is "special purpose property" as referenced in Ford, supra.  Instead, in advocating for the cost approach to valuing the subject property defendant argues that the sales approach is inapplicable because there are no comparable sales for a property such as the subject because of its opulence and unique features built to the whims of the plaintiffs.  According to defendant, those features account for "functional obsolescence" for which there is no market.

Defendant's theory is based initially on Turnley v. Elizabeth, 76 N.J.L. 42 (1908).  There, in reviewing a taxpayer's claim for a reduction in a tax assessment, the court determined that the criterion for determining value was a "hypothetical sale," where the buyers were hypothetical purchasers, not actual and existing purchasers.  The property under review in that matter had been completed with a number of "features and fancies that, while adding greatly to its cost, have added little or nothing to its selling price or market value."  Id. at 44.

Similarly, in Royal Mfg. Co. v. Board of Equalization of Taxes, 76 N.J.L. 402 (1908), the taxpayer constructed buildings "of an unusual type, constructed especially for the purposes of the prosecutor and unsuited to ordinary manufacturing purposes. . ." at 406.  The court upheld an assessment based in substantial part on the cost of construction.  In CPC Int'l, Inc. v. Englewood Cliffs, 193 N.J. Super. 261, 265 (App. Div. 1984), the court considered the issue of functional obsolescence, which it described as follows:

> "Functional obsolescence" is a term used to describe the diminution of a building's market value resulting from the fact that it contains costly features which were installed to gratify the owner or which are unique to the special purpose of the building but which do not enhance its value on the market. The terms "superfluity," "duplication of facilities" and "overbuilding" are also used to describe such structures whose functional characteristics exceed reasonably foreseeable demands. Bostian v. Franklin State Bank, 167 N.J. Super. 564, 572-73 (App.Div.1979). Investments made to satisfy the whim of an owner, or for a special purpose, or out of extravagance are not necessarily reflected in the building's fair market value. Id. at 570. This is unrelated to factors such as outmoded characteristics associated with the age of the building or failure to keep pace with advancing technology. Id. at 576.

The court there found that "no allowance will be made for the special purpose character of the building or for overbuilt features where the original owner erected the buildings for his own needs, remains in possession, and continues to enjoy the improvements which it installed and for which the allowance is claimed." Id at 269. See, also, General Motors Corp. v. Linden, supra 22 N.J. Tax 95 (Court will presume that a hypothetical buyer exists whose requirements are reasonably accommodated by the property in question.)

Defendant maintains therefore, that the sales comparison approach is inapplicable because plaintiffs overbuilt the subject property with features specific to plaintiffs' own specific needs for which no market exists, plaintiffs remain in possession and continue to enjoy the improvements which they constructed. Defendant thus argues that the plaintiffs' sales comparison approach must be rejected and only the cost approach may be applied.

The court does not agree that the subject property is so unique that the sales comparison approach is inapplicable. Clearly, both parties provided comparable sale properties having similar size, and similar amenities. The court's rejection of the defendant's position that the cost approach is the only applicable valuation method does not mean that the cost approach has no application. The court, therefore, will consider defendant's cost approach as well as the sales comparison approach presented by both the plaintiffs' and defendant's experts.

e. **Application of the Sales Comparison Approach**

Under the sales comparison approach, market value is obtained "by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract." Appraisal Institute, The Appraisal of Real Estate, 377 (14th ed. 2013). Using various analysis techniques such as "paired data analysis, trend analysis, statistics, and other techniques" the

appraiser focuses on similarities and differences that affect value . . . which may include variations in property rights, financing terms, market conditions and physical characteristics." Id. at 378.

The weight to be afforded an expert's testimony relative to adjustments "depends upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation (citation omitted). If the bases for the adjustments are not made evident the court cannot extrapolate value." Inmar Associates v. Edison Township, 2 N.J. Tax 59, 66 (Tax 1980). "Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard." Dworman v. Tinton Falls, 1 N.J. Tax 445, 458 (Tax 1980) (citing to Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959), certif. denied, 30 N.J. 153 (1959)). For an expert's testimony to be of any value to the trier of fact, it must have a proper foundation. See Peer v. City of Newark, 71 N.J. Super. 12, 21 (App. Div. 1961), certif. denied, 36 N.J. 300 (1962). When "an expert offers an opinion without providing specific underlying reasons . . . he ceases to be an aid to the trier of fact." Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div. 1996). An expert witness is required to "give the why and wherefore of his expert opinion, not just a mere conclusion." Ibid.

Plaintiff's expert's opinion of value suffers from a number of deficiencies. For example, despite the wide variations in the gross living areas of his comparable sales, he made no adjustment for size for properties of 8,143 square feet or less, opining that at the point of homes of 8,000 to 10,000 square feet, the "market stops looking at the size" and instead the market looks at the number of bedrooms and bathrooms. Yet he made no adjustment for the difference between the bedrooms and baths of any of the comparable sales and the subject property, nor did he take into account that the subject property could easily accommodate additional bedrooms. Further, when the expert did make adjustments for the inferior size of the comparable properties, he provided no explanation or support for the amount of the adjustment.

26

While he made adjustments to account for the amenities at the subject property and the comparable sales, those adjustments are suspect because the expert did not have firsthand knowledge of any of the amenities at any of the comparable sales, nor did he provide any explanation as to how the particular adjustment was determined. He indicated that the percentage adjustment provided by him could be sufficient to construct the additional amenities at the comparable property, but nothing in his testimony or his report supported the cost needed to construct any of the amenities in question, nor did he identify any of the amenities he deemed necessary to provide comparability.

Additionally, while the expert provided an explanation for his location adjustment, he failed to adequately explain why average sales prices in Saddle Brook of almost three times those in Wyckoff, would result in a location adjustment of 10%, and average sales prices in Franklin Lakes 1.5% times those in Wyckoff, would support a location adjustment of 5%. Similarly, the expert acknowledged that there was no support for the amount of his lot size adjustment.

Thus, the reliability of the adjustments made, and the plaintiffs' expert's opinion of value, are questionable. Accordingly, the court rejects plaintiffs' expert's conclusions of value.

Defendant's expert's conclusions under the sales comparison approach suffer from similar deficiencies. Defendant's expert provided no support for any of the adjustments made by him in his comparable sales approach, presumably because he deemed it an inappropriate approach for the subject property. It is difficult for the court to grant defendant's expert's sales comparison approach any more weight than the expert did. The conclusions reached thereunder are therefore rejected.

f. **Defendant's cost approach**

The court also finds the defendant's cost approach to be unreliable for the following reasons.

27

In reaching his opinion as to land value, the expert made adjustments for size and location, neither of which were supported in any respect. Even accepting the expert's opinion that adjustments for the subject property's superior size and location when viewed in relationship to the comparable sale properties was merited, defendant's expert provided nothing to support the amount of the adjustment. The court has no basis upon which to determine the credibility of these adjustments.

Furthermore, the improvement cost calculations suffer from a number of unexplained discrepancies. The time adjustment made by the expert was not supported. It is unknown whether this adjustment was provided by MVS or is a function of the depreciation schedule or the expert's opinion. Although the expert indicated that he utilized the 2014 MVS factors for tax years 2014 through 2016 and made what he deemed as appropriate time adjustments, he actually utilized the 2016 MVS factors. No explanation as to how this discrepancy may have affected the ultimate result was provided.

Other adjustments were not supported by any references in the report or in the expert's testimony. No support was provided for a number of the costs of improvements, such as the pool, the cabana and the landscaping improvements. The adjustment for these improvements constituted a significant portion of the total amount, but were provided without adequate explanation or support.

Additionally, the expert made an adjustment of 5% in each year for EOH&P. No data was provided to support this adjustment. The only support given by the expert for his adjustment of 5% was his belief that this Court has "codified" EOH&P at 10%, with possible reductions to 5% for certain "larger more costly properties". The expert neither supported his position that the Court has codified EOH&P at 10% or that the subject property merited a reduction to 5%. It is the obligation of the appraiser to establish support for the need to account for EOH&P as well as the

amount. "[A]n estimate of entrepreneurial profit or entrepreneurial incentive is only as reliable and precise as the available market data warrants." Appraisal of Real Property, supra at 574. Merely suggesting that the NJ Tax Court has "codified" a certain percentage for Entrepreneurial Overhead and Profit is an insufficient basis to establish an estimate. See, Badische Corp. v. Town of Kearny, 11 N.J. Tax 385 (Tax 1994), aff'd in part, rev'd in part and remanded 288 N.J. Super. 171 (App. Div.) 1996)(without proofs as to entrepreneurial profit the court can make no finding.)

The expert's suggestion that the actual costs corroborate his estimates is also problematic. At first glance, the actual costs incurred would appear to support the expert's conclusion, however a closer inspection reveals substantial variations. The actual costs of construction, incurred for the most part in 2009, reflect construction costs of approximately $7,100,000, 75%-80% of the costs developed by defendant's expert. However, this is not corroborative of the costs obtained by the expert. The similarity of result appears to result from the difference between the actual purchase price of the land ($4,000,000) and the fair market value of the land concluded by the expert ($2,738,000). Furthermore, a substantial majority of the actual costs were incurred in 2008. If depreciation is taken into account, the differential between actual costs and the expert's conclusions becomes even greater.

For all of these reasons, as well as the various discrepancies noted in the discussion regarding the expert's cost approach, the court finds that the defendant's expert's conclusions of value based on the cost approach are unreliable, lacking in credibility and must be rejected.

The court acknowledges its obligation "to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Associates v. Township of Wall, 99 N.J. 265, 280 (1985) (citing New Cumberland Corp v. Borough of Roselle, 3 N.J. Tax 345, 353 (Tax 1981)). In order to do so, however, the court must be presented with credible and competent evidence from which a finding

of true value may be adduced. Neither plaintiff nor defendant provided this court with competent evidence from which true value can be obtained.

## V.  Conclusion

Thus the court concludes that plaintiff has failed to prove, by a fair preponderance of the evidence, that the local property tax assessments for the years in question exceed the true market value of the subject property for such years. Further, the court concludes that defendant also failed to provide credible and competent evidence establishing the true value of the subject property. Accordingly, the court enters judgments affirming the assessments for each of the years under review and dismisses plaintiffs' complaints in these matters.

The assessments are affirmed and plaintiffs' complaints are dismissed.

Very truly yours,

Kathi.F. Fiamingo, J.T.C.